WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Carla Vasquez,

                Plaintiff,

v.

Carolyn W. Colvin, Commissioner of
Social Security,

                Defendant.

No. CV-12-02486-PHX-BSB

**ORDER**

Carla Vasquez (Plaintiff) seeks judicial review of the final decision of the Commissioner of Social Security (the Commissioner), denying her application for disability insurance benefits under the Social Security Act (the Act).  The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and have filed briefs in accordance with Local Rule of Civil Procedure 16.1.  For the following reasons, the Court affirms the Commissioner's decision.

## I.  Procedural Background

On March 29, 2010, Plaintiff applied for disability insurance benefits under Titles II and XVI of the Act.  42 U.S.C. § 401-34.  (Tr. 203.)[1]  Plaintiff alleged that she had been disabled since January 1, 2009, due to a back injury, degenerative disc disease, and depression.  (Tr. 203-09, 222.)  After the Social Security Administration (SSA) denied Plaintiff's initial application and her request for reconsideration, she requested a hearing

---

[1]  Citations to "Tr." are to the certified administrative transcript of record.  (Docs. 12 and 16.)

1   before an administrative law judge (ALJ).  After conducting a hearing, the ALJ issued a

2   decision finding Plaintiff not disabled under the Act.  (Tr. 84-93.)  This decision became

3   the final decision of the Commissioner when the Social Security Administration Appeals

4   Council denied Plaintiff's request for review.   (Tr. 1-5); *see* 20 C.F.R. § 404.981

5   (explaining the effect of a disposition by the Appeals Council.)   Plaintiff now seeks

6   judicial review of this decision pursuant to 42 U.S.C. § 405(g).

7   **II.    Medical Record**

8        The record before the Court establishes the following history of diagnosis and

9   treatment related to Plaintiff's back injury and mental health.  The record also includes

10  opinions from State Agency Physicians who either examined Plaintiff or reviewed the

11  records related to her physical and mental health, but who did not provide treatment.

12              **A.    Records Related to Physical Health**

13                   **1.    Treating Physician Khalid Sethi, M.D.**

14       Plaintiff saw Dr. Khalid Sethi for back pain in 2009.  In February 2009, an MRI of

15  Plaintiff's back showed a herniated disc with a mass effect on a nerve root.  (Tr. 356-57.)

16  On March 21, 2009, Dr. Sethi operated on Plaintiff's back.  (Tr. 479.)  During a follow-

17  up appointment in late March 2009, Plaintiff reported that she was "doing well," but was

18  experiencing "moderate low back pain."    (Tr. 353.)   Dr. Sethi reported that on

19  examination Plaintiff was alert, cooperative, and in no obvious distress.  (*Id*.)  Dr. Sethi

20  noted that Plaintiff had a mildly antalgic gait (a limp), but good leg strength.   He

21  prescribed narcotic pain medication and physical therapy.  (*Id*.)

22       During a May 12, 2009 office visit with Dr. Sethi, Plaintiff reported "mild

23  tolerable" discomfort but had "no active complaints."  (Tr. 352.)  Dr. Sethi observed that

24  Plaintiff had "excellent strength" in her arms and legs with "no focal myotomal

25  weakness," and a stable gait.  (*Id*.)  Dr. Sethi opined that Plaintiff was doing "quite well"

26  and stated that he would continue to see her on a routine basis.  (*Id*.)

27       During a November 10, 2009 office visit, Plaintiff reported that she had recently

28  been experiencing numbness in her left foot and pain in her back that radiated into her

right leg and foot.  (Tr. 351.)  Dr. Sethi reported that on examination, Plaintiff had "some palpable spasms and point tenderness" in her lower back, a positive straight leg raise test on the right side, and decreased sensation in the right nerve distribution, but full 5/5 leg strength and a "steady and stable" gait.  (Tr. 351.)  Dr. Sethi ordered an MRI, which showed signs of the prior surgery, but no evidence of residual or recurrent disc herniation.  (Tr. 372.)  During an examination later that month, Dr. Sethi noted that Plaintiff had some palpable muscle spasms, but she had negative straight leg raise tests, good muscle strength, and a steady gait.  (Tr. 350.)  Dr. Sethi noted Plaintiff's report that past epidural injections did not relieve her pain and that physical therapy and medication provided "mild relief."  (*Id*.)  He started her on anti-depressant medication to "calm down some of the nerve and burning issues."  (*Id*.)

In January 2010, Plaintiff returned to Dr. Sethi and reported continuing lower back pain with right leg radiculopathy.  (Tr. 349.)  She also reported numbness and burning in her left thigh, which traveled to her left foot.  Plaintiff denied any gross weakness.  (*Id*.)  Dr. Sethi reported that on examination, Plaintiff had a "quite steady and stable gait," she was "limited in extreme of forward flexion and extension," and had mild spasm.  (*Id*.)  She had a negative straight leg raise test and had 5/5 strength in her lower extremities.  (*Id*.)  In February 2010, an MRI showed recurrent nerve root encroachment.  (Tr. 348 (duplicated at Tr. 478).)  Dr. Sethi recommended "redo decompression and stabilization at L5-S1."  (Tr. 348.)  He noted that Plaintiff was relocating to Arizona and would seek treatment there.  (*Id*.)

## 2.    Treating Physician Paul LaPrade, Jr., M.D.

In April 2010, Plaintiff saw Dr. Paul LaPrade at Southwestern Neurosurgery in Arizona for low back and leg pain.  (Tr. 360.)  She also reported depression and a past history of migraine headaches.  (*Id*.)  Plaintiff reported that her pain was worse when she was sitting or standing for an extended period of time.  Dr. LaPrade reported that on examination Plaintiff was alert, coherent, and in no acute distress, with negative straight leg raise tests, full 5/5 motor strength in her lower extremities, and had intact sensation.

- 3 -

1  Because Plaintiff declined epidural injections due to skin irritation caused by injections,

2  Dr. LaPrade recommended "redo right L5-S1 decompression with microdiskectomy,"

3  which he performed in May 2010. (Tr. 360-63 (duplicated in part at Tr. 468-69); *see also*

4  Tr. 371.)   Following Plaintiff's surgery, on May 20, 2010, Dr. LaPrade noted that

5  Plaintiff had "some spasms in her right buttock and back," but that her leg was "basically

6  pain free."  Plaintiff was taking one Vicodin per day.  (Tr. 364 (duplicated at Tr. 471).)

7        In June 2010, Plaintiff reported to a physician assistant at Dr. LaPrade's office that

8  she experienced some lower back and right buttock pain if she sat for a long time, but that

9  her right leg pain was "basically gone."  (Tr. 470.)   Plaintiff reported taking Vicodin

10  about twice per day when she felt sore.  The physician assistant observed that Plaintiff

11  was "doing quite well." (Tr. 470.)

12                 **3.        Treating Physician Dennis Roy Parker, D.O.**

13        Plaintiff received treatment from Dr. Dennis Roy Parker during late 2010 and

14  early 2011.[2]  (Tr. 448-59, 462-63.)  She continued to receive medication to manage her

15  low back pain during that time.  Plaintiff occasionally reported headaches.  (Tr. 448-59,

16  462-63.)  Plaintiff reported lower back pain, burning, muscle spasms, and some radiating

17  pain.   (Tr. 446, 454, 456.)   Treatment notes indicated that Plaintiff sometimes had

18  "vertebral tenderness," but had a normal gait, posture, range of motion, and strength.

19  (Tr. 445, 454, 458, 463.)  In May 2011, an MRI of her brain and pituitary was normal.

20  (Tr. 460.)

21                 **4.        Examining Physician Brian Briggs, M.D.**

22        In May 2010, Plaintiff saw Dr. Brian Briggs for a physical evaluation related to

23  her Social Security claim.  (Tr. 377.)  Plaintiff complained of low back pain.  (Tr. 377.)

24  Dr. Briggs noted that Plaintiff was fourteen days post back surgery.  He reported that on

25  examination Plaintiff exhibited a normal ability to follow simple instructions.   She

26  walked with an antalgic gait and had reduced range of motion in her back due to the

27  _____

28        [2]  It is unclear whether Dr. Parker provided all the treatment during this period.
The record contains "medical visit forms" that do not clearly identify the provider.

1    recent surgery, but she could hop, squat, and tandem walk, heel/toe walk, and she

2    exhibited intact sensation, normal reflexes, and full 5/5 strength and regular range of

3    motion in her arms and legs.  (Tr. 377-78.)  Dr. Briggs did not perform straight leg raise

4    tests due to the recent surgery.  X-rays of Plaintiff's back were normal.  Dr. Briggs

5    declined to assess Plaintiff's functional abilities in view of the recent surgery; however,

6    he opined that she did not have any conditions that would impose limitations for twelve

7    continuous months.  (Tr. 374, 377-81.)

8                    **5.      State Agency Examining Physician John Prieve, D.O.**

9             On October 26, 2010, Plaintiff was examined by state agency physician John

10   Prieve in connection with the Social Security claim.  She reported to Dr. Prieve that she

11   could walk up to a half-mile, stand for one hour at a time, and sit for up to thirty minutes

12   at a time (with constant shifting).  (Tr. 406.)  She further reported that she handled her

13   own self-care and did some light housework.  She stated that she avoided heavy work,

14   lifting, and bending.  (Tr. 407.)  Dr. Prieve noted that Plaintiff had an "antalgic, short-

15   spaced regular gait," and that she could tandem walk, toe walk, heel walk, hop on either

16   foot (but complained of pain), and squat normally (but complained of pain).  (Tr. 407.)

17   After examining Plaintiff, Dr. Prieve opined that in an eight-hour day Plaintiff could: lift

18   twenty pounds occasionally and ten pounds frequently; sit for four to six hours;

19   stand/walk for four hours intermittently; occasionally climb, stoop, kneel, crouch, and

20   crawl; and frequently reach, handle, finger, and feel.  (Tr. 406-11.)

21                   **6.      State Agency Reviewing Physicians Schenk and Disney**

22            In June 2010, state agency physician Paul Schenk, M.D., reviewed the record and

23   opined that Plaintiff had not shown severe physical impairments.  (Tr. 109-10.)   In

24   November 2010, state agency physician Thomas Disney, M.D. reviewed the record and

25   opined that Plaintiff could occasionally lift/carry twenty pounds, frequently lift/carry ten

26   pounds, stand/walk four hours, sit for four to six hours (alternating sitting and standing),

27   occasionally climb ladder/ropes/scaffolds, occasionally stoop/crouch/kneel, and could

28   frequently balance.  (Tr. 124-25.)

7.      **Treating Physician Lawrence M. Kutz, D.O.**

In August 2011, Plaintiff saw Dr. Lawrence Kutz for back pain.  He reported that on examination Plaintiff was in no acute distress, had a mildly antalgic gait, moderate right-side tenderness, and positive straight leg raising on the right, but normal range of motion in her back and full 5/5 muscle strength.  Dr. Kutz ordered nerve conduction studies, which showed results consistent with radiculopathy.  An MRI showed small disc protrusion and scarring around nerve roots at two levels of her spine.  Dr. Kutz prescribed nerve pain medication and opined that she was an excellent candidate for lumbar epidural injections.  (Tr. 481-83.)

B.      **Mental Health Records**

1.      **Examining Psychologist Carl Mansfield, Ph.D.**

In June 2010, Plaintiff saw Dr. Carl Mansfield for a psychological evaluation related to her Social Security claim.  Plaintiff reported a ten-to-fifteen-year history of depression.  (Tr. 385.)  She stated that she had "a little problem with memory," (explaining that she "sometimes mislays keys") but denied concentration problems.  Plaintiff stated that she prepared two to three "full meals" per week and did light cooking on other days.  She also reported that she washed dishes, swept and vacuumed, shopped for groceries, watched television, and used the computer.  (Tr. 386.)  Dr. Mansfield reported that on examination Plaintiff exhibited "[n]ear average" memory and average cognitive functioning.  Dr. Mansfield diagnosed "mild" major depression and opined that Plaintiff would not have any significant work-related limitations.  (Tr. 383-87.)

2.      **Examining Psychologist Ron J. Lavit, Ph.D.**

In December 2010, Plaintiff saw Dr. Ron Lavit for a psychological examination related to her Social Security claim.  Plaintiff reported that she had experienced depression since about age fifteen.  (Tr. 413.)  She also reported having migraine headaches and auditory and visual hallucinations.  (Tr. 415.)  Plaintiff reported that her activities included getting the children ready for school, checking homework, making dinner, watching television, driving, talking on the telephone, attending medical

appointments, going to the library, grocery shopping, and going out to dinner with her boyfriend.  (Tr. 414-15.) Plaintiff scored twenty-nine out of thirty possible points on a "mini mental status exam."  (Tr. 417.)

Dr. Lavit assessed Plaintiff's cognitive skills as "average to bright-normal in range."  (Tr. 420.)  He noted that, although she reported difficulty with concentration and memory, she did not exhibit any "significant difficulties" during the examination. Dr. Lavit opined that Plaintiff might have some problems with understanding and memory.  (Tr. 421.)  He found that she was "moderately limited" in concentration, persistence, and pace, could carry out simple instructions and ask simple questions, but could not make simple work decisions.  (*Id*.)  He also found that she could not interact appropriately with the general public.  (Tr. 421.)

### 3.   Reviewing Psychologist Lazorwitz and Psychiatrist Zuess

In June 2010, state agency psychologist Nicole Lazorwitz reviewed the record and opined that Plaintiff had not shown severe mental impairments.  (Tr. 109-10.)  In late 2010, state agency psychiatrist Jonathan Zuess, M.D., reviewed the record and opined that Plaintiff could perform simple work on a sustained basis, but might perform best in settings with limited social interaction.  (Tr. 121-23, 126-28.)

### 4.   Terros, Inc.

In January 2011, Plaintiff presented to Terros, Inc., for an initial evaluation related to her mental health.  (Tr. 472.)  Plaintiff reported experiencing depression, anger, anxiety, and auditory and visual hallucinations.  Nurse practitioner Marilyn Staires assessed major depressive disorder and obsessive compulsive disorder.  (Tr. 476.)  In February 2011, Nurse Staires completed a functional capacity (mental) questionnaire. (Tr. 429.)  She opined that Plaintiff had: marked limitations in social functioning, concentration, persistence, and pace; episodes of decompensation; and moderate restrictions in activities of daily living.  She rated Plaintiff's global assessment of functioning (GAF) at 53, indicating moderate symptoms.  (Tr. 429; *see also* Tr. 435-37

1     (March 28, 2011 note repeating the February 2011 GAF rating, but noting that Plaintiff

2     had not been seen at Terros since January 2011).)[3]

3         Plaintiff was next seen at Terros in April 2011, when she presented to physician

4     assistant Tracie Serrato for evaluation.  (Tr. 433.)  Plaintiff reported depression, anger,

5     anxiety, and bedtime auditory and visual hallucinations.  On examination, she had good

6     concentration, intact memory, and logical thought processes with non-psychotic thought

7     content.  The physician assistant adjusted Plaintiff's medication.  (Tr. 431-34; *see also*

8     Tr. 435-37.)

9     **III.     Administrative Hearing Testimony**

10        Plaintiff was represented by counsel during the administrative proceedings.

11    However, her counsel withdrew before the administrative hearing and Petitioner appeared

12    pro se at the hearing.  (Tr. 140, 173.)  The ALJ advised Plaintiff of her right to have a

13    representative present at the hearing, but she chose to proceed without representation.

14    (Tr. 22, 508-09.)

15        Plaintiff was in her thirties at the time of the administrative hearing.  She had a

16    high school education, and her past relevant work included telephone operator, assistant

17    manager, call center operator, babysitter, packer, and assembly worker.  (Tr. 203, 223,

18    518-20.)[4]  Plaintiff testified at the administrative hearing that she quit her last job as a

19    taxi dispatcher in April 2007 because her employer allegedly falsified records.  (Tr. 518.)

20    She stated that she was unable to work due to depression, anxiety, obsessive compulsive

21    disorder, and a back impairment.  (Tr. 513.)  Plaintiff stated that she had received an

22    epidural injection two days before the hearing, and that her doctor was waiting to

23    determine whether the injection was effective before recommending further treatment.

24

25

26       [3]  A GAF score ranks psychological, social, and occupational functioning on a hypothetical continuum of mental illness ranging from zero to 100.  A GAF score of 51 to 60 indicates moderate symptoms.  *See* Am. Psychiatric Ass'n, Diagnostic & Statistical

27    Manual of Mental Disorders 32-34 (4th ed. 2000) (DSM IV).

28       [4]  Pages 506-35 of the certified administrative record are located in the supplemental transcript.  (Doc. 16.)

1   (Tr. 522.)  Plaintiff testified that she took medication for nerve pain, and that she received

2   counseling and medication for her mental health issues.  (Tr. 522-23.)

3       Plaintiff stated that she lived with her boyfriend, her boyfriend's thirteen-year-old

4   son and his twelve-year-old daughter, and her boyfriend's adult brother.  (Tr. 514-15.)

5   Plaintiff stated that she cooked dinner but that she did not do very much housework.

6   (Tr. 523.)  Plaintiff testified that she had not camped or been boating since summer 2009.

7   (Tr. 524-25.)

8       Vocational expert David Janus also testified at the administrative hearing.

9   (Tr. 527.)  The vocational expert responded to a hypothetical question from ALJ.  The

10  ALJ asked the vocational expert to assume someone Plaintiff's age with similar education

11  and work experience who could perform work at the sedentary or "less than light" level

12  with the following limitations: sitting and standing/walking four hours each per day with

13  a sit/stand option; frequent balancing; occasional stooping, crouching, kneeling, and

14  climbing of ramps and stairs; occasional right lower extremity foot control operation; no

15  crawling or climbing ladders, ropes, or scaffolds; avoid concentrated exposure to extreme

16  temperatures, excessive vibration, unprotected heights, and moving machinery; limited to

17  simple, routine, repetitive tasks with only occasional decision making and occasional

18  changes in work setting; and occasional interaction with co-workers or the general public.

19  (Tr. 528-32.)

20      The vocational expert testified that such an individual could perform unskilled,

21  sedentary work as an assembler and addresser.  (Tr. 530-32.).  The ALJ asked Plaintiff if

22  she wanted to ask the expert any questions.  (Tr. 532.)  Plaintiff asked one question

23  regarding her ability to find work based on her difficulty sitting and standing for long

24  periods and her need to constantly shift position.  (Tr. 533.)  The expert responded that he

25  had considered that limitation in response to the ALJ's hypothetical.  (Tr. 533.)  Plaintiff

26  stated that she did not have any further questions.  (*Id.*)  At the conclusion of the hearing,

27  the ALJ asked Plaintiff if she had "anything else" she wanted to ALJ to know and she

28  responded "[n]ot that I know of."  (Tr. 534.)

**IV.    The ALJ's Decision**

A claimant is considered disabled under the Social Security Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for supplemental security income disability insurance benefits).   To determine whether a claimant is disabled, the ALJ uses a five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

**A.    Five-Step Evaluation Process**

In the first two steps, a claimant seeking disability benefits must initially demonstrate (1) that he is not presently engaged in a substantial gainful activity, and (2) that his disability is severe.  20 C.F.R. § 404.1520(a) (c).  If a claimant meets steps one and two, he may be found disabled in two ways at steps three and four.  At step three, he may prove that his impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. pt. 404. 20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is presumptively disabled.  If not, the ALJ determines the claimant's residual functional capacity (RFC).  At step four, the ALJ determines whether a claimant's RFC precludes him from performing his past work.  20 C.F.R. §  404.1520(a)(4)(iv).  If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education.  If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

**B.    ALJ's Application of Five-Step Evaluation Process**

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period. (Tr. 86.)  At step two, the ALJ found that Plaintiff had the following severe impairments:

1  "degenerative disc disease of the lumbar spine status post lumbar surgery x 2, obesity

2  (5'2" x 210 pounds), OCD (obsessive-compulsive disorder), panic attacks, and

3  depression."[5]  (Tr. 86.)  At the third step, the ALJ found that the severity of Plaintiff's

4  impairments did not meet or medically equal the criteria of an impairment listed in 20

5  C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)  At step four, the ALJ concluded that

6  Plaintiff retained the RFC to perform a limited range of unskilled sedentary work with

7  various limitations.  (Tr. 88.)  The ALJ concluded that Plaintiff could not perform her

8  past relevant work.  (Tr. 93.)  At step five, the ALJ found that considering Plaintiff's age,

9  education, work experience, and RFC, she could perform other "jobs that exist in

10  significant numbers in the national economy."  (*Id*)  The ALJ concluded that Plaintiff was

11  not disabled within the meaning of the Act.  (Tr. 94.)

12         **C.  Evidence Submitted after the ALJ's Decision**

13         After the ALJ issued his September 16, 2011 decision, Plaintiff retained new

14  counsel (Tr. 76), and submitted additional treatment records to the Appeals Council;

15  these additional records post-dated the ALJ's decision by almost a year.  (Tr. 487-505

16  (July and August 2012 treatment records).)  The Appeals Council found that the

17  additional evidence did not provide a basis for changing the ALJ's decision.  (Tr. 1-5.)

18  ─────────────────

19       [5]  Plaintiff also complained of headaches.  The ALJ found her headaches non-
severe "because they result in no more than minimal limitations in functioning," Plaintiff
20  did not mention headaches in her hearing testimony, and there was no medical evidence
of "extensive treatment" for headaches.  (Tr. 86.)  In her opening brief, Plaintiff argues
21  that the ALJ failed to discuss that headaches do not have a visible cause on imaging or
that Plaintiff was treated for headaches.  (Doc. 17 at 20.)  She also asserts that she was
22  unrepresented at the hearing and "was never asked by the ALJ about headaches."  (*Id.*)

23       Although Plaintiff appears to take issue with the ALJ's determination that her
headaches were non-severe, she does not clearly challenge that determination and in her
24  Reply she states that headaches "are not a major component of the claimed impairments."
(Doc. 21 at 7.)  Moreover, Plaintiff bears the burden of establishing that her headaches
25  constitute a severe impairment, and she does not cite to any record evidence indicating
that her headaches impacted her ability to perform basic work activities.  *See Edlund v.*
26  *Massanari*, 253 F.3d 1152, 1160 (9th Cir. 2001) (claimant bears burden of showing that
he suffers from an impairment affecting his ability to perform basic work activities); *see*
27  *also Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir.1999) ("Although [claimant] clearly
does suffer from diabetes, high blood pressure, and arthritis, there is no evidence to
28  support his claim that those impairments are 'severe.'").  Accordingly, Plaintiff has not
shown that the ALJ erred in concluding that her headaches did not constitute a severe
impairment.

**V.      Standard of Review**

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The district court reviews the Commissioner's final decision under the substantial evidence standard and must affirm the Commissioner's decision if it is supported by substantial evidence and it is free from legal error.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  Even if the ALJ erred, however, "[a] decision of the ALJ will not be reversed for errors that are harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Substantial evidence means more than a mere scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see also Webb v Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  In determining whether substantial evidence supports a decision, the court considers the record as a whole and "may not affirm simply by isolating a specific quantum of supporting evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotation and citation omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion."  *Batson v. Comm'r of* Soc. *Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

**VI.     Plaintiff's Claims**

Plaintiff asserts that the ALJ erred in his assessment of the medical source opinion evidence and by rejecting Plaintiff's symptom testimony without providing clear and convincing reasons for doing so.  (Doc. 17 at 1-2.)  Plaintiff asks the Court to remand this matter pursuant to sentence four of § 405(g) for a determination of disability benefits.

1    Alternatively, Plaintiff requests that the Court remand this matter under sentence

2    six of § 405(g) to consider new evidence.  In response, the Commissioner argues that the

3    ALJ's decision is free from legal error and is supported by substantial evidence in the

4    record, and that Plaintiff has not met the standard for a sentence six remand.  (Doc. 18.)

5    For the reasons discussed below, the Court finds that the ALJ's assessment of Plaintiff's

6    RFC is supported by substantial evidence in the record and is free from legal error and

7    affirms the Commissioner's disability determination.[6]

8         **A.    Weight Assigned to Medical Source Opinions**

9         In weighing medical source evidence, the Ninth Circuit distinguishes between

10   three types of physicians: (1) treating physicians, who treat the claimant; (2) examining

11   physicians, who examine but do not treat the claimant; and (3) non-examining physicians,

12   who neither treat nor examine the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

13   1995).  Generally, more weight is given to a treating physician's opinion.  *Id*.  The ALJ

14   must provide clear and convincing reasons supported by substantial evidence for

15   rejecting a treating or an examining physician's uncontradicted opinion.  *Id.*; *Reddick v.*

16   *Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ may reject the controverted opinion

---

17   [6] The ALJ determined that Plaintiff has the RFC to:

18

19         Perform less than the full range of sedentary work as defined
           in 20 CFR § 404.1567(a), with lifting and carrying up to 10
20         pounds frequently and 20 pounds occasionally, sitting,
           standing and walking for 4 out of 8 hours per day, no
21         climbing ladders, ropes or scaffolds, occasional climbing
           ramps and stairs, occasional stooping, crouching, and
22         kneeling, frequent balancing, no crawling, the need to avoid
           concentrated exposure to extreme temperatures, excessive
23         vibration, unprotected heights and moving machinery, the
           need for a sit stand option not resulting in being off task for
24         more than 10% of the work period, with occasional operation
           of right lower extremity controls, and with the ability to
25         perform simple and repetitive tasks with no more than
           occasional decision making, occasional changes in the
26         workplace setting, and occasional interaction with coworkers
           and the general public.

27

28   (Tr. 88.)

- 13 -

1    of a treating or an examining physician by providing specific and legitimate reasons that

2    are supported by substantial evidence in the record.  *Bayliss v. Barnhart*, 427 F.3d 1211,

3    1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.

4          Opinions from non-examining medical sources are entitled to less weight than

5    treating or examining physicians.  *Lester*, 81 F.3d at 831.  Although an ALJ generally

6    gives more weight to an examining physician's opinion than to a non-examining

7    physician's opinion, a non-examining physician's opinion may nonetheless constitute

8    substantial evidence if it is consistent with other independent evidence in the record.

9    *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).  When evaluating medical

10   opinion evidence, the ALJ may consider "the amount of relevant evidence that supports

11   the opinion and the quality of the explanation provided; the consistency of the medical

12   opinion with the record as a whole; [and] the specialty of the physician providing the

13   opinion . . . ."  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

14              **1.    The ALJ's Evaluation of Medical Source Opinions Related to**
                        **Plaintiff's Physical Functional Limitations**
15

16         The record includes several opinions regarding Plaintiff's physical functional

17   abilities from examining physicians Briggs and Prieve and from state agency reviewing

18   physician Schenk. Plaintiff asserts that the ALJ erred by assigning more weight to the

19   opinions of examining and reviewing state agency physicians than to Plaintiff's treating

20   physicians.  (Doc. 17 at 7-8.)  Plaintiff's argument fails because the record does not

21   include any opinions by an acceptable treating source about Plaintiff's functional

22   limitations during the relevant period and she does not identify any acceptable treating

23   source opinions that the ALJ erred in discrediting.  (*Id*.)  As discussed below, the ALJ did

24   not err in assigning weight to these opinions.

25              **a.    Treating Physicians**

26         The ALJ discussed the treatment records from Plaintiff's treating physicians

27   Dr. LaPrade and Dr. Kutz.  (Tr. 89.)  The ALJ noted that after her May 2010

28   laminectomy revision at L5-S1, Plaintiff reported to Dr. LaPrade that her leg pain had

1    resolved with some muscle spasms in the right buttock and back.   (Tr. 89, 364.)

2    Dr. LaPrade noted that Plaintiff was taking one Vicodin per day.  (Tr. 364.)   Lumbar

3    spine x-rays from May 24, 2010 were negative.  (Tr. 374.)

4          The ALJ also discussed Dr. Kutz's August 17, 2011 treatment notes.   Dr. Kutz

5    noted that Plaintiff reported pain and had some sensory deficit in the right L5-SI and had

6    a mild limp on the right side.   However, he found that Plaintiff (1) showed no signs of

7    apparent distress on exam; (2) had no swelling in her lower limbs, hips, low back, or

8    cervical spine; (3) had normal lumber cervical range of motion, "full and pain free range

9    of motion with respect to internal and external rotation" of her hips, and normal "facet

10   loading"; (4) she was stable in her lower back, hips, and cervical spine, her muscle

11   strength was 5/5 throughout, and her neurological signs were  within normal limits, and

12   her coordination was intact.  (Tr. 482.)

13         Contrary to Plaintiff's assertion, the ALJ did not mischaracterize Dr. LaPrade's

14   and Dr. Kutz's treatment notes or substitute his lay opinion for that of the treating

15   physicians. (Doc. 17 at 19, 21.)  Rather, the ALJ considered those notes in their entirety,

16   including the notations that Plaintiff complained of pain, had a positive straight leg test, a

17   mild limp, and some sensory deficits and muscle spasms.  (Tr. 89.)  However, the ALJ

18   also considered Dr. Kutz's notes that Plaintiff's muscle strength was 5/5 throughout, that

19   she had normal neurological signs, that she appeared in no apparent distress, and

20   displayed normal mood.  (Tr. 89.)  The ALJ also noted that Dr. LaPrade's notation that

21   Plaintiff was making good progress after surgery and reported that her leg pain was

22   resolved but with some muscle spasms, was consistent with Plaintiff's report during that

23   same time period that she could walk one half mile and do some light house work.

24   (Tr. 89, 360-64, 406.)   The ALJ considered the treating physicians' treatment notes in

25   their entirety and did not isolate evidence that detracted from a finding of disability.  *See*

26   *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985) (the ALJ must weigh both evidence

27   that supports and that which detracts from his conclusion).

28

1    Plaintiff also asserts that the ALJ "fabricated" that Dr. Kutz's August 17, 2011
2  treatment notes included a finding that Plaintiff's conditions were "stable." (*Id.*; Tr. 89.)
3  The ALJ did not "fabricate findings" that were not in the medical record. (Doc. 17 at 19.)
4  Under the "assessment" heading near the end of Dr. Kutz's August 17, 2011 treatment
5  notes, he described Plaintiff's "displacement of lumbar intervertebral disc without
6  myelopathy," "radiculitis – lumbar," and "post laminectomy syndrome of the lumbar
7  region" as "stable." (Tr. 89.)   Contrary to Plaintiff's assertion, the ALJ did not
8  "fabricate" those findings.

9                    **b.      Examining State Agency Physicians**

10    In June 2010, state agency physician Briggs examined Plaintiff and noted that she
11  had minimal limitations due to her recent back surgery, but there were no "abnormal
12  orthopedic signs" on examination, and Plaintiff had no "conditions which [would] impose
13  limitation for twelve continuous months." (Tr. 378-379.) Because Plaintiff had back
14  surgery fourteen days before the examination, Dr. Briggs declined to specifically assess
15  Plaintiff's functional abilities. (Tr. 379.) The ALJ gave Dr. Briggs's opinion "less
16  weight" because it was inconsistent with the "greater objective record, which shows the
17  claimant is limited to no more than sedentary work at best." (Tr. 90.)

18    Plaintiff asserts that the ALJ erred in finding Dr. Briggs's opinion inconsistent
19  with the record because Dr. Briggs did not consider Dr. Prieve's and Dr. Lavitt's reports
20  when he assessed the medical record. (Doc. 17 at 16.) However, Plaintiff also states that
21  the ALJ "correctly dismissed" Dr. Briggs report. (Doc. 17 at 20.) Even if the ALJ erred
22  in some way in assessing Dr. Briggs's opinion, any error was harmless because the ALJ
23  assigned "less weight" to the assessment that Plaintiff "had no functional limitations that
24  would last for 12 continuous months," and concluded that the objective medical evidence
25  showed that Plaintiff was limited to "no more than sedentary work." (Tr. 90.) Thus, the
26  ALJ found that Plaintiff was more limited than Dr. Briggs had assessed.

27    In October 2010, state agency physician Prieve examined Plaintiff and completed
28  a physical functional assessment. (Tr. 406-11.) Dr. Prieve opined that Plaintiff could:

1   (1) stand/walk four hours intermittently in an eight-hour day; (2) sit four to six hours

2   intermittently in an eight-hour day; (3) lift twenty pounds occasionally and ten pounds

3   frequently; (4) occasionally climb, stoop, kneel, crouch, and crawl; and (5) reach, handle,

4   finger, and feel without restriction.  (Tr. 410-11.)  He further found that Plaintiff should

5   avoid heights, but otherwise had no environmental restrictions.  (Tr. 411.)

6       The ALJ gave Dr. Prieve's opinion "no weight" because he was not a properly

7   licensed physician at the time he performed the examination and offered his opinion, and

8   therefore, he was not a "qualified medical source" or an "acceptable medical source"

9   under the Social Security Regulations.  (Tr. 92.)  Plaintiff asserts that the ALJ erred in

10  rejecting Dr. Prieve's opinion because he was "on probation for a non-medical offense in

11  another state," but was licensed to practice in Arizona.  (Doc. 17 at 20-21, Doc. 21 at 2-

12  3.)  Plaintiff has submitted a print out from the Arizona Board of Osteopathic Examiners

13  indicating that Dr. Prieve currently has an "active" license that was issued on January 15,

14  2003.[7]  (Doc. 17, Ex. B.)  However, under the heading "Board Action," Dr. Prieve is

15  identified as having been on probation from February 1, 2007 until August 8, 2011.  (*Id.*)

16      In another case in this district, *Renteria v. Colvin*, 2013 WL 4478698, at *11

17  (D. Ariz. Aug. 19 2013), the court considered whether an ALJ erred in declining to rely

18  on Dr. Prieve's opinion in a social security proceeding because his license had been

19  suspended.[8]  In that case, the court noted that Dr. Prieve's license to practice medicine

20  was suspended by the Massachusetts Board of Registration in Medicine from February 1,

21  2007 until August 8 2011, as a result of disciplinary action taken in the State of

22  Massachusetts.  *Id.*  The court explained that, although Dr. Prieve's Arizona license did

23  not appear to have been revoked during the five-year period in question, he was on

24  probation in Arizona during that time.  *Id.*  The court concluded that because Dr. Prieve's

25  license was suspended by the State of Massachusetts at the time he rendered his opinion,

26  _____

27  [7]  This information is also available on azmd.gov (last visited Jan. 8, 2014.)

28  [8]  In this case and *Renteria*, Dr. Prieve is identified as Dr. John Prieve D.O. with
    MDSI Physician Services 1701 West 2450 South, Ogden Utah 84401.  (*Renteria v.
    Colvin*, 12cv994-PHX-MHB, Tr. 511 at Doc. 14; Tr. 406.)

1    the ALJ did not err in assigning that opinion no weight in accordance with 20 C.F.R.

2    § 404.1503a.  *Id.*

3         After reviewing the record in this case, including the information from the Arizona

4    Board of Osteopathic Examiners that Plaintiff provided, and the decision and record in

5    *Renteria,* which provide more detailed information about the status of Dr. Prieve's

6    license in 2010 when he rendered his opinion in this case, and after confirming that

7    information by visiting azmd.gov (last visited Jan. 8, 2014),[9] the Court concludes that the

8    ALJ did not err in assigning no weight to Dr. Prieve's opinion because his license was

9    suspended by the State of Massachusetts at the time he rendered his opinion.   The

10   regulations provide that the Agency "will not use any individual . . . whose license to

11   provide health care services is currently revoked or suspended by *any* State licensing

12   authority . . .  or who has surrendered such a license while formal disciplinary

13   proceedings involving professional conduct are pending."   20 C.F.R. § 404.1503a

14   (emphasis added).  Accordingly, the ALJ properly discounted Dr. Prieve's opinion.

15            **c.    Reviewing State Agency Physician**

16         In July 2010, state agency reviewing physician Schenk opined that Plaintiff had

17   not shown a severe physical impairment.  (Tr. 110.)  The ALJ gave this opinion "greater

18   weight" because it was consistent with the objective medical record "particularly

19   regarding [the] finding that Plaintiff could perform at least some sedentary work activity

20   with some postural and environmental limitations."  (Tr. 93.)  Plaintiff argues that the

21   ALJ erred in relying on Dr. Schenk's opinion because Dr. Schenk agreed with

22   Dr. Briggs's report and that the ALJ had found that report inconsistent with the record as

23   a whole.  Plaintiff also argues that Dr. Schenk's report is out of date because his review

24   _____

25        [9]  A court may take judicial notice of documents outside of the complaint that are
     "matters of public record" as long as the facts noticed are not "subject to reasonable
26   dispute."  *See* Fed. R. Evid. 201.  The court may also take judicial notice of pleadings,
     memoranda, and other verifiable documents from earlier related litigation.  *Reyn's Pasta*
27   *Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

28

of the medical record did not include the reports by Dr. Prieve and Dr. Lavitt or the "latest two years of up-to-date material medical evidence, evidence that indicated the severity and limitations precluding substantive full-time work." (Doc. 17 at 16.)

Although an ALJ generally gives more weight to an examining physician's opinion than to a non-examining physician's opinion, a non-examining physician's opinion may nonetheless constitute substantial evidence if it is consistent with other independent evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). The ALJ assigned greater weight to Dr. Schenk's opinion that Plaintiff could perform at least sedentary work activity with some postural limitations. (Tr. 93.) This opinion was consistent with medical record, including Dr. Disney's November 2010 opinion that Plaintiff was limited to sedentary functional activity based on his assessment that she could lift/carry twenty pounds occasionally and ten pounds frequently, stand/walk four hours in an eight-hour day, sit four to six hours in an eight-hour day "with alternate standing/sitting every hour, and could occasionally push or pull with her lower extremities." (Tr. 126.)

Dr. Schenk's opinion is also consistent with Dr. Briggs's opinion that Plaintiff had a normal range of motion in her cervical, thoracic, and lumbar spine, normal range of motion in all major joints, and that she had no functional limitations. (Tr. 379.) Dr. Schenk's opinion is also consistent with Dr. LaPrade's May 2010 treatment notes that approximately one month after "a right L5-S1 microdiskectomy," Plaintiff's leg was "basically pain free" and "everything looks fine." (Tr. 470-471.)

Finally, as the ALJ noted, Dr. Schenk's opinion that Plaintiff is limited to sedentary work is also consistent with Dr. Kutz's 2011 treatment notes that, although Plaintiff reported pain and had some sensory deficit in the right L5-SI and had a mild limp on the right side, she (1) showed no signs of apparent distress on exam; (2) had no swelling in her lower limbs, hips, low back, or cervical spine; (3) had normal lumber cervical range of motion, "full and pain free range of motion with respect to internal and external rotation" of her hips, and normal "facet loading"; (4) she was stable in her lower

- 19 -

1    back, hips, and cervical spine, her muscle strength was 5/5 throughout, and her

2    neurological signs were within normal limits, and her coordination was intact.  (Tr. 482.)

3            Plaintiff's argument that the ALJ erred in relying on Dr. Schenk's opinion because

4    Dr. Schenk agreed with Dr. Briggs's opinion, which the ALJ had rejected, fails because

5    the ALJ did not completely reject Dr. Briggs's opinion.  (Tr. 90.)   Rather, he assigned

6    "less weight" to Dr. Briggs's opinion that Plaintiff had no functional restrictions.  (*Id*.)

7    Dr. Schenk stated that he "agreed with Dr. Briggs's assessment that this case is "non-

8    severe." (Tr. 112.)    Dr. Schenk opined that Plaintiff did not have any "disabling

9    conditions that would limit [her] ability to perform basic work related activities" and that

10   her "conditions were not severe enough to meet Social Security guidelines."  (Tr. 112.)

11   Although the ALJ did not explain why he assigned little weight to Dr. Briggs's

12   assessment that Plaintiff had no functional limitation, but assigned "greater weight" to

13   Dr. Schenk's similar opinion, any error in assigning more weight to Dr. Schenk's opinion

14   was harmless because the ALJ found Plaintiff more limited than Dr. Schenk's

15   assessment.

16           Plaintiff also argues that the ALJ erred in relying on Dr. Schenk's opinion because

17   he did not consider reports prepared by Dr. Prieve and Dr. Lavitt.  Because Dr. Schenk

18   rendered his opinions in June 2010, he could not have reviewed the reports prepared by

19   Dr. Prieve and Dr. Lavitt in October and December 2010, respectively.   Moreover,

20   because Dr. Prieve's license was suspended in Massachusetts at the time he rendered his

21   opinion, the ALJ did not err in considering the report of Dr. Schenk that did not include a

22   discussion of Dr. Prieve's opinion.

23           Finally, Plaintiff argues that ALJ erred in assigning weight to Dr. Schenk's

24   opinion because Dr. Schenk did not review evidence from the last two years.  (Doc. 17 at

25   16.)  Apparently, Plaintiff is referring to records from her treating physicians from July 5,

26   2011 through February 11, 2013.  (Doc. 17 at 22.)  The reviewing physician, who issued

27   an opinion in 2010, could not have reviewed evidence that did not exist at time he

28   rendered his opinion.    Plaintiff argues that this evidence was available after the

- 20 -

1    September 1, 2011 administrative hearing, and argues that this case should be remanded

2    to direct the ALJ to consider the new evidence.   The Court will address this issue in

3    Section VI(E).

4                **2.    The ALJ's Evaluation of Medical Source Opinions Related to
                         Plaintiff's Mental Health**
5

6                        **a.    Examining Physician Dr. Lavit**

7            In December 2010, examining psychologist Dr. Lavit opined that Plaintiff might

8    have difficulty with understanding and memory, could not interact appropriately with the

9    general public, and could not make simple work decisions.   Dr. Lavit also found that

10   Plaintiff could carry out short instructions, ask simple questions to request assistance, and

11   could perform ordered, consistent, stable tasks.  (Tr. 420-21.)  The ALJ gave this opinion

12   "less or no weight" because it was "internally inconsistent and subjective in nature," and

13   was based on Plaintiff's subjective complaints and self-reports.  (Tr. 92.)

14           Plaintiff asserts that the ALJ erred in assigning little to no weight to this opinion

15   because it was "very consistent with the plaintiff's treating doctors' assessments."

16   (Doc. 17 at 6-7, 16, 20.)   Contrary to Plaintiff's assertion, the ALJ did not err in

17   determining the weight to assign this opinion.  The ALJ reasonably found that Dr. Lavit's

18   opinion that Plaintiff would have some limitations in understanding or memory was

19   contradicted by the psychologist's own observation that, despite reported difficulties with

20   concentration and memory, Plaintiff displayed no such limitations on examination.

21   (Tr. 91; compare Tr. 421 with Tr. 420).  The ALJ also reasonably discounted Dr. Lavit's

22   opinion that Plaintiff could not make simple work decisions based on her normal findings

23   when she examined Plaintiff (including findings of a normal cognitive capacity).  (Tr. 91;

24   compare Tr. 421 with Tr. 416-20).  The inconsistencies between Dr. Lavit's examination

25   notes and her opinion are valid reasons for discounting the examining psychologist's

26   opinion.  *See* 20 C.F.R. §§ 404.1527(c)(3) (ALJ must consider support for opinion);

27   *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (discrepancy between doctor's

28   opinion about the claimant's limited ability to stand and walk and the doctor's clinical

1    notes the same day provided a clear and convincing reason for discounting doctor's

2    opinion).

3          Additionally, although the ALJ stated that he gave little weight to Dr. Lavit's

4    opinion, the ALJ's decision was consistent with parts of that opinion.  To the extent that

5    Dr. Lavit opined that Plaintiff was limited in her ability to interact with the general

6    public, the ALJ found that Plaintiff should have no more than occasional interaction with

7    the public.  (*Compare* Tr. 421 *with* Tr. 88.).  In addition, the ALJ found that Plaintiff

8    should be limited to unskilled work, which is consistent with Dr. Lavit's opinion that

9    Plaintiff could carry out short instructions and perform ordered, consistent, and stable

10   tasks.  (*Compare* Tr. 421 with Tr. 88); *see* 20 C.F.R. § 404.1568(a) (defining unskilled

11   work); SSR 82-41,1982 WL 31389, at *2 (stating that unskilled work is the least complex

12   type of work).

13                    **b.    Nurse Practitioner Marilyn Staires**

14         Plaintiff also argues that ALJ erred in discounting the opinion of her

15   "psychological counselor."  (Doc. 17 at 20.)  Although Plaintiff does not identify the

16   "psychological counselor," she cites to treatment notes from physician assistant Tracie

17   Serrato (Tr. 431) and nurse practitioner Marilyn Staires at Terros (Tr. 429).  (Doc. 17 at

18   20.)  The ALJ did not specifically discuss any opinions of physician assistant Serrato.

19   (Tr. 91.)

20         The ALJ assigned "less weight" to Nurse Staires's February 2, 2011 opinion on a

21   Functional Capacity Questionnaire (Mental) on which Plaintiff had "marked limitations

22   in several areas of mental functioning."  (Tr. 92; Tr. 429.)  The ALJ explained that Nurse

23   Staires's opinion was inconsistent with the greater objective medical record ─ including

24   progress notes from Terros showing good insight and judgment, good concentration, and

25   intact memory ─ and that her opinion was not entitled to greater weight because a nurse

26   practitioner is not an acceptable medical source.  (*Id.*)

27         As the ALJ noted, a nurse practitioner is not an acceptable medical source and

28   thus cannot be considered a treating source whose opinion may be entitled to controlling

weight.  *See* SSR 06–03p, 2006 WL 2329939, at *2; 20 C.F.R. § 404.1513(d)(1); *Wilson v. Astrue*, 2012 WL 2873591, at *3 (D. Ariz. Jul. 9, 2012).   When there is an agency relationship between an "acceptable medical source" and an "other source,"  evidence from that "other source" may be ascribed to the supervising "acceptable medical source." *Buck v. Astrue*, 2010 WL 2650038, * 5 (D. Ariz. July 1, 2010) (discussing *Gomez v. Chater*, 74 F.3d 967, 970–71 (9th Cir.1996) (affording great weight to a nurse practitioner's opinion because she worked closely on an interdisciplinary team with a doctor)).   Here, only Nurse Staires signed the February 2, 2011 report.  (Tr. 429.)   The record contains no evidence indicating that Nurse Staires worked as part of a team or had any sort of guidance or other input from a physician.   Plaintiff does not provide any information regarding the participation of a doctor or other acceptable medical source in her treatment at Terros.   There is no evidence that Nurse Staires was closely supervised by a physician, consulted with a physician regarding Plaintiff's care, or otherwise had an agency relationship with a physician.   *Cf. Gomez*, 74 F.3d at 971 (nurse practitioner consulted with physician numerous times regarding the patient and worked closely under physician's supervision).

Therefore, the ALJ correctly concluded that Nurse Staires was not an acceptable medical source and that her treatment notes and reports should not be credited to an acceptable medical source.[10]   *See Freeman v. Astrue*, 2011 WL 4625334, *4-5 (E.D. Wash. Oct. 3, 2011) (finding that "interdisciplinary team" approach did not apply when there was no evidence that nurse practitioner worked closely with doctor who signed nurse's opinion letter); *Garcia v. Astrue*, 2011 WL 3875483, at *15 (E.D. Cal. Sept. 1, 2011) (finding that doctor's signature on reports authored by physician assistant did not transform reports into evidence from an "acceptable medical source" when the physician assistant prepared the reports following his examination of claimant).

---

[10]   Similarly, to the extent that the ALJ may have discounted any opinions expressed by physician assistant Tracie Serrato, no error occurred because Ms. Serrato was not an acceptable medical source and her opinions are not entitled to controlling weight.

In addition to finding that Nurse Staires was not an acceptable medical source, the ALJ considered her as an "other source" opinion, and gave valid reasons for discounting her opinion.  (Tr. 91-92); *see Molina v. Astrue*, 674 F.3d 114, 1111 (9th Cir. 2012) (an ALJ may discount an "other source" opinion by giving reasons germane to that witness). The ALJ reasonably found that Nurse Staires's opinion that Plaintiff had "marked" limitations in mental functioning was inconsistent with her GAF score of 53 indicating "moderate" symptoms.  (Tr. 92, 429); *see Schmidt v. Colvin*, 2013 WL 5372845, at *2 n.3 (E.D. Cal. Sept. 25, 2013) (citing Diagnostic and Statistical Manual of Mental Disorders, at 34 (Am. Psychiatric Ass'n 4th ed. 2000) (A GAF score of 51–60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).").

The ALJ also found that Nurse Staires's opinion that Plaintiff had marked limitations in mental functioning was inconsistent with Terros treatment notes showing that Plaintiff had "good insight and judgment," as well as good concentration and intact memory.  (Tr. 92; compare Tr. 429 with Tr. 432.)  Additionally, the ALJ correctly noted that the record did not reflect any episodes of decompensation, such as psychiatric hospitalization.  (Tr. 87.)  *See* 20 C.F.R. pt. 404, subpt. p, app'x 1 § 12.00(4) (defining "episodes of decompensation").    Considering these records, the ALJ reasonably discounted Nurse Staires's opinion.  *See* SSR 06-03p, 2006 WL 2329939, at *4 (ALJ may consider the degree to which the source presents relevant evidence to support an opinion); *Molina*, 674 F.3d at 1111 (ALJ reasonably discounted other source opinion which was unsupported and was inconsistent with other record evidence; *see also Melton v. Comm'r of Soc. Sec. Admin.*,442 Fed. Appx. 339, 341 (9th Cir. 2011) (unpublished) (GAF rating indicating moderate symptoms was inconsistent with an opinion regarding marked limitations in functioning).

**B.    Plaintiff's Subjective Complaints**

1.    **The Two-Step Analysis**

An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom. *Smolen*, 80 F.3d at 1282. Instead, the claimant must only show that an objectively verifiable impairment "could reasonably be expected" to produce his pain. *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d at 1160-61 (9th Cir. 2008) ("requiring that the medical impairment could reasonably be expected to produce pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon").  If a claimant produces medical evidence of an underlying impairment that is reasonably expected to produce some degree of the symptoms alleged, and there is no affirmative evidence of malingering, an ALJ must provide "clear and convincing reasons" for an adverse credibility determination. *See Smolen*, 80 F.3d at 1281; *Gregor v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).

In evaluating a claimant's crediblity, the ALJ may consider the objective medical evidence, the claimant's daily activities, the location, duration, frequency, and intensity of the claimant's pain or other symptoms, precipitating and aggravating factors, medication taken, and treatments for relief of pain or other symptoms.  *See* 20 C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.  An ALJ may also consider such factors as a claimant's inconsistent statements concerning his symptoms and other statements that appear less than candid, the claimant's reputation for lying, unexplained or

1    inadequately explained failure to seek treatment or follow a prescribed course of

2    treatment, medical evidence tending to discount the severity of the claimant's subjective

3    claims, and vague testimony as to the alleged disability and symptoms.  See *Tommasetti*

4    *v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008); *Smolen*, 80 F.3d 1273, 1284 (9th Cir.

5    1996).   If substantial evidence supports the ALJ's credibility determination, that

6    determination must be upheld, even if some of the reasons cited by the ALJ are not

7    correct.  *Carmickle*, 533 F.3d at 1162 .

8         Relying on the Ninth Circuit decision in *Bunnell*, the Commissioner appears to

9    argue that an ALJ need not provide "clear and convincing" reasons for discrediting a

10   claimant's testimony regarding subjective symptoms, and instead must make findings

11   that are "'supported by the record' and 'sufficiently specific to allow a reviewing court to

12   conclude the adjudicator rejected the claimant's testimony on permissible grounds.'"

13   (Doc. 18 at 18-19 (citing *Bunnell*, 947 F.2d at 345-46).)  In *Bunnell*, the court did not

14   apply the "clear and convincing" standard, and the Commissioner argues that because no

15   subsequent en banc court has overturned *Bunnell*, its standard remains the law of the

16   Ninth Circuit.  (Doc. 18 at 8-9.)  Although the Ninth Circuit has not overturned *Bunnell*,

17   subsequent cases have elaborated on its holding and have accepted the clear and

18   convincing standard.  *See Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234

19   (9th Cir. 2011); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *Lingenfelter*, 504

20   F.3d at 1036; *Reddick*, 157 F.3d at 722; *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir.

21   1989).   Accordingly, the Court will determine whether the ALJ provided clear and

22   convincing reasons for discounting Plaintiff's credibility.

23              **2.       Plaintiff's Pain and Symptom Testimony**

24        Although the ALJ stated that Plaintiff's "medically determinable impairments

25   could reasonably be expected to cause the alleged symptoms alleged," he found that

26   Plaintiff's "statements concerning the intensity, persistence and limiting effects of these

27   symptoms are not credible to the extent that they are inconsistent with the above residual

28

functional capacity assessment." (Tr. 89.)  Plaintiff argues that the ALJ did not give clear and convincing reasons for discrediting her symptom testimony.

Because there was no record evidence of malingering, the ALJ was required to provide clear and convincing reasons for concluding that Plaintiff's description of her functional limitations was not wholly credible.  The ALJ listed several factors in support of his credibility assessment.[11]  First, the ALJ found that, although Plaintiff alleged an inability to work, she had quit her last job as a taxi cab dispatcher in April 2007 following difficulties with her employer who was allegedly falsifying records. (Tr. 90.)  During the administrative hearing, Plaintiff testified that she quit her taxi dispatcher job in 2007 because her employer was "reducing wages during overtime" and "falsifying records." (Tr. 518.)  Plaintiff's testimony that she quit her last job well before the alleged disability onset date of January 2009, for a reason other than her medical impairments, is a legally sufficient reason for discounting Plaintiff's credibility.  *See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (record evidence, including claimant's hearing testimony, that he left his job because he was laid off, rather than because he was injured, was a sufficient reason for disregarding pain testimony).

Second, the ALJ noted that Plaintiff had collected unemployment benefits in 2009 and 2010, and found that the receipt of such benefits undermined her credibility because these benefits are based upon the recipient's assertion that they can work, which contradicted Plaintiff's application for disability benefits.  (Tr. 89 (citing administrative hearing exhibit 6D [Tr. 217]).)  Receipt of unemployment benefits may undermine a

---

[11]   The Commissioner asserts that the ALJ gave six reasons for discrediting Plaintiff: (1) she quit her last job and had a sporadic work history; (2) she experienced extended periods of improved symptoms and functioning after her back surgeries; (3) although Plaintiff complained of headaches, the record showed limited treatment for headaches; (4) Plaintiff looked for work after she allegedly became disabled; (5) Plaintiff engaged in a wide array of activities despite her alleged impairments; and (6) Plaintiff's testimony that she had not gone boating or camped since the summer of 2009 was contradicted by her boyfriend's statement that Plaintiff occasionally engaged in these activities in 2010. (Tr. 18 at 19-21.)  Although the ALJ's opinion discusses these factors, it is not clear that he relied on all of these factors to discount Plaintiff's credibility. (Tr. 89-90.)  Therefore, the Court limits its discussion to the factors that the ALJ clearly linked to his credibility determination.

claimant's alleged inability to work full time.  *Carmickle*, 533 F.3d at 1162 (9th Cir. 2008) ( citing *Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988)).  This is because unemployment benefit applications may require that a claimant hold himself out as available for full time work.  *Copeland*, 861 F.2d at 542.  Plaintiff's unemployment benefits application is not in the record before this Court.  During the administrative hearing, Plaintiff agreed that in her unemployment application, she indicated that she was "ready, willing, and able to work." (Tr. 517.)  However, her testimony does not indicate whether she held herself out as available to work full time.  Thus, the record does not establish whether Plaintiff held herself out as available for full-time or part-time work.  Accordingly, the Court cannot determine whether Plaintiff made an assertion regarding her availability for full time work, and the ALJ's inference on the matter does not constitute a clear and convincing reason for discrediting Plaintiff.  *See Carmickle*, 533 F.3d at 1162 (holding oneself out as able to perform full time work, not part time, is inconsistent with disability allegations).  Thus, substantial evidence does not support this basis for the ALJ's credibility finding.  *See Ellis v Astrue*, 2011 WL 5025839, at *6 (D. Or. Oct. 20, 2011).

Third, the ALJ noted that Plaintiff's limited work history detracted from her credibility because it "suggests a lack of motivation for work." (Tr. 89.)  In her reply brief, Plaintiff asserts that she had a steady work history for the ten years before 2007. (Doc. 21.)  The record reflects that during the ten year period before the alleged disability onset date, Plaintiff's earnings ranged from a low of $159.65 in 1998 to a high of $14,461.65 in 2006.  (Tr. 211-215.)  Additionally, Plaintiff did not have any earnings in 1991, 1992, 1996, and 1999.  (Tr. 214.)  Plaintiff apparently worked in 1997, 1998, and from 2000 until she quit her job in 2007.  Nonetheless, even  assuming that Plaintiff was paid only the federal minimum wage that applied in 1997, $4.75, *see* www.dol.gov (last visited Jan. 8, 2014), it appears that she engaged in less than part-time employment during several of those years when her earnings ranged from $159.65 to $3,578.20.

1   (Tr. 214 earnings for 1997, 1998, 2001, 2003.)   Thus, the ALJ properly characterized

2   Plaintiff's work history as "somewhat limited."  (Tr. 89.)

3   The ALJ properly considered Plaintiff's limited work history before the alleged

4   onset date, noting that her work history raises a question of her motivation to work.  (*Id*);

5   *see Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (poor work history shows

6   little propensity to work);[12] *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)

7   ("A lack of work history may indicate a lack of motivation instead of a lack of ability");

8   *Brown v. Comm'r of Soc. Sec.*, 2011WL 5117911, at *6 (D. Or. Oct. 26, 2011) (work

9   history that included several years during which claimant had no earnings was

10  inconsistent with allegation that claimant was unable to work due to alleged

11  impairments); *Hardy v. Astrue*, 2009 WL 2880707, at *11 (E.D. Cal. Sept. 3, 2009)

12  (finding ALJ did not err in finding that claimant's history of short-term jobs undermined

13  her credibility).

14  Therefore, the Court concludes that the ALJ's reference to Plaintiff quitting her

15  job in 2007, well before the alleged disability onset date and for reasons other than her

16  impairments, and the ALJ's reference to Plaintiff's limited work history, are based upon

17  the record and are legally sufficient reasons for discounting Plaintiff's credibility.  This

18  Court may affirm an ALJ's overall credibility conclusion even when not all of the ALJ's

19  reasons are upheld.  *Batson*, 359 F.3d at 1197.  The ALJ's credibility determination is

20  affirmed.

21  **C.    Evaluation of Lay Witness Evidence**

22  Lay testimony regarding a claimant's symptoms "is competent evidence that an

23  ALJ must take into account," unless the ALJ "expressly determines to disregard such

24  testimony and gives reasons germane to each witness for doing so."  *Lewis v. Apfel*, 236

25  F.3d 503, 511 (9th Cir. 2001).  In rejecting lay testimony, the ALJ need not cite the

26  _____

27  [12]  The claimant in *Thomas* had years of unemployment between jobs (Doc. 21 at

28  6), but that case is nonetheless informative here because Plaintiff reported no earnings
during 1991, 1992, 1996, and 1999 and had limited earnings equal to less than a twenty-
hour week in 1997, 1998, 2001, and 2003.

1   specific record as long as he provides "germane" reasons for rejecting lay witness
2   evidence.  *See Molina*, 674 F.3d at 1114 (9th Cir. 2012); *Lewis,* 236 F.3d at 511.  An ALJ
3   is not required to discuss every witness's testimony on an individualized basis.  Rather, if
4   the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only
5   cite to those reasons when rejecting a different witness's similar testimony.  *See*
6   *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (holding that
7   because "the ALJ provided clear and convincing reasons for rejecting [the claimant's]
8   own subjective complaints, and because [the lay witness's] testimony was similar to such
9   complaints, it follows that the ALJ also gave germane reasons for rejecting [the lay
10  witness's] testimony").

11      In 2010, Plaintiff's boyfriend Anthony Potter submitted two "Third Party Function
12  Report[s]" describing Plaintiff as severely impaired.  (Tr. 231-238, 263-270.)  Plaintiff
13  asserts that the ALJ erred by ignoring evidence of "substantial limitations" in Plaintiff's
14  activities set forth in those reports.  (Doc. 17 at 9, 11, 12.)  The ALJ found the third party
15  statements "less than persuasive based on a lack of objective medical evidence,
16  particularly regarding the assertion that the claimant's impairments not only result in
17  limitations but ultimately are disabling."  (Tr. 90.)  The ALJ further noted that Mr. Potter
18  indicated that Plaintiff engaged in activities such as "dishes, laundry, and dusting, that
19  she gets the kids to school, helps them with homework, cooks, drives, leaves the house by
20  herself, shops and pays bills."  (*Id*.)  The ALJ also found that the Mr. Potter's statement
21  that Plaintiff was able to go camping in April 2010, "albeit with difficulty sleeping in a
22  tent," conflicted with Plaintiff's testimony that she last camped and went boating in 2009.
23  (*Id*.)  The ALJ found that the Mr. Potter's statement conflicted with Plaintiff's assertion
24  that her children do all of the household chores and that she only helps with some of the
25  housework.  (*Id*.)

26      Although an ALJ may discount lay testimony if it conflicts with the medical
27  evidence, *Lewis*, 236 F.3d at 511; *see also Bayliss*, 427 F.3d at 1218 (9th Cir. 2005)
28  (inconsistency with medical evidence constitutes germane reason); *Vincent v. Heckler*,

739 F.2d 1393, 1395 (9th Cir.1984) (proper for ALJ to discount lay testimony that conflicts with medical evidence), it was improper for the ALJ to reject the lay testimony in this case as "not supported by the objective medical evidence," without pointing to any specific evidence in support of this conclusion.  *See Bruce*, 557 F.3d at 1116 (improper for ALJ to discredit testimony of claimant's wife as not supported by medical evidence in record).  However, any error was harmless because the ALJ gave other legally sufficient reasons for discounting the third party statements from Plaintiff's boyfriend.  *See Batson*, 359 F.3d at 1197 (the court may affirm an ALJ's overall credibility conclusion even when not all of the ALJ's reasons are upheld).

An ALJ may reject lay witness evidence if other evidence in the record regarding the claimant's activities is inconsistent with that evidence.  *See Carmickle*, 533 F.3d at 1164 (ALJ's rejection of lay witness evidence because it was inconsistent with claimant's successful completion of continuous full-time coursework constituted reason germane to claimant).  The ALJ properly noted the wide range of activities of daily living discussed in the "third party statements," including doing the dishes, doing laundry, doing housework, getting the kids to school, cooking, driving, leaving the house alone, shopping, and paying bills, and concluded that those activities of daily living did not support the degree of pain or limitations that Mr. Potter alleged in those reports.  (Tr. 90); *see Burch v. Barnhart*, 400 F.3d 676, 680–81 (9th Cir.2005) (upholding ALJ determination that daily activities detracted from plaintiff's credibility).

Additionally, the ALJ correctly discounted Mr. Potter's third party statements because his statements that Plaintiff camped and did household chores were inconsistent with Plaintiff's testimony regarding those activities.  (Tr. 90.)  Inconsistencies in a lay witness's statements regarding the claimant's level of functioning are a germane reason for giving the lay witness testimony limited weight.  *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir.2005); *Ditto v. Comm'r of Soc. Sec. Admin.*, 401 Fed. Appx. 192, 193–94 (9th Cir. 2010) ("inconsistencies in [plaintiff's] husband's statements regarding his wife's level of functioning" is germane reason).  In summary, the ALJ did not err in

1    evaluating the third party statements because he gave germane reasons for rejecting some

2    portions of those statements.

3        **D.    The ALJ's Record Development and Hypothetical Questions**

4        Plaintiff further argues that the ALJ erred in failing to develop the record.

5    (Doc. 17 at 16-17.)  To the extent that Plaintiff alleges that the ALJ erred in failing to

6    develop the record as a whole, her claim fails.   The ALJ's duty to supplement the

7    administrative record is triggered by ambiguous evidence, the ALJ's own finding that the

8    record is inadequate, or the ALJ's reliance on an expert's conclusion that the evidence is

9    ambiguous.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).  The ALJ found

10   that the record was adequate to make an assessment of the severity of Plaintiff's

11   impairments.  The Court agrees with the ALJ's determination.  Therefore, the record was

12   not ambiguous or inadequate to trigger the ALJ's duty to further develop the record.

13       Plaintiff specifically argues that the ALJ erred by failing to pose hypothetical

14   questions to the vocational expert that included all of her limitations.  (Doc. 17 at 17.)

15   Hypothetical questions posed to a vocational expert must include all the substantial,

16   supported physical and mental functional limitations of the particular claimant.  *Flores v.*

17   *Shalala*, 49 F.3d 562, 570–71 (9th Cir.1995); *see Light v. Soc. Sec. Admin.*, 119 F.3d 789,

18   793 (9th Cir. 1997).  If a hypothetical does not reflect all the functional limitations, the

19   expert's testimony as to available jobs in the national economy lacks evidentiary value.

20   *DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991); *but see Matthews v. Shalala*, 10

21   F.3d 678 (9th Cir. 1993) (failing to include all limitations in a hypothetical may be

22   harmless error if the ALJ's conclusions are supported by other reliable evidence).

23   Although the ALJ may pose to the expert a range of hypothetical questions, based on

24   alternate interpretations of the evidence, substantial evidence must support the

25   hypothetical that ultimately serves as the basis for the ALJ's determination. [13]  *Embrey v.*

26   *Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

27

28       _____

     [13]  Similarly, "[t]he ALJ is not bound to accept as true the restrictions presented in
     a hypothetical question propounded by a claimant's counsel."  *Magallanes v. Bowen*, 881

1    Plaintiff specifically argues that the ALJ erred by failing to ask "indicated

2 questions to the [vocational expert] regarding the plaintiff's need to lie down." (Doc. 17

3 at 17.) Plaintiff does not point to any record evidence indicating that she needed to lie

4 down during the day. (Doc. 16-17, Doc. 21 at 10.) Rather, she asserts that "Plaintiff did

5 not know to ask the VE about her physical requirement of needing to lie down

6 periodically during a work day," and that she only managed to inform the vocational

7 expert that she needed to shift position frequently. (Doc. 17 at 16.) Plaintiff has pointed

8 to no credible evidence, other than her claim presented in this Court that she needed to lie

9 down, to establish the additional limitations that she believes should have been included

10 in hypothetical question to the vocational expert. Because the ALJ may exclude

11 unsupported limitations from the hypothetical questions posed to the vocational expert,

12 he did not err in failing to include in the hypothetical questions the limitation that

13 Plaintiff needed to lie down during the work day. *See Bayliss*, 427 F.3d 1211, 1217-18

14 (recognizing that an ALJ must include all limitations supported by substantial evidence in

15 a hypothetical question to the vocational expert, but may exclude unsupported limitations

16 and disregard vocational testimony premised on such limitations).

17    Plaintiff further argues that the ALJ erred in failing to pose a hypothetical to the

18 vocational expert that included all of the functional restrictions set forth in the assessment

19 completed by "the Terros (psychological) counselor." (*Id.*) Plaintiff refers to the

20 functional assessment completed by nurse practitioner Staires. (Tr. 429.) She argues that

21 the hypothetical posed to the ALJ should have accounted for nurse practitioner Staires's

22 assessment that Plaintiff had a "pervasive loss of interest in all activities, was emotionally

23 withdrawn or isolated, had difficulty thinking or concentrating experienced hallucinations

24 or delusions, and had mood disturbances." (Doc. 17 at 18; Tr. 429.) However, the ALJ

25 properly assigned less weight to this assessment because Nurse Staires was not an

26

27 F.2d 747, 756 (9th Cir.1989). The ALJ may accept these hypotheticals if they are

28 supported by substantial evidence or reject them if they are not. *Id.* at 756–757.

1    acceptable medical source.  (Tr. 91.)  The ALJ properly discounted her opinion on that

2    basis.  Accordingly, the ALJ was not required to include the limitations assessed by nurse

3    Staires in a hypothetical to the vocational expert.  *See Magallanes*, 881 F.2d at 756

4    (hypothetical questions posed to a vocational expert must set out all the substantial,

5    supported limitations and restrictions of the particular claimant); *Batson*, 359 F.3d at

6    1197–98 (ALJ was not required to incorporate evidence that was properly discounted).

7          Moreover, the hypothetical question upon which the ALJ relied in making his

8    disability determination limited the hypothetical individual to simple, routine tasks, with

9    only occasional decision making and occasional changes in work setting, and occasional

10   interaction with co-workers or the general public.  (Tr. 528-32.)  These restrictions took

11   into account Plaintiff's difficulty concentrating and interacting with others.  Accordingly,

12   the ALJ did not err in posing hypothetical questions to the vocational expert.

13          **E.     Remand Pursuant to Sentence Six**

14          Finally, Plaintiff asks the Court to remand this case under sentence six of § 405(g)

15   for consideration of "new" evidence submitted with her brief.  (Doc. 17 at 22-23.)  This

16   evidence consists of additional treatment records from Plaintiff's treating physicians from

17   July 5, 2011 through February 11, 2013.  (Doc. 17, Ex. A.)  For the reasons set forth

18   below, a sentence six remand is not appropriate.

19          Sentence six of § 405(g) authorizes the district court to remand cases to the

20   Commissioner for consideration of additional evidence when the evidence is "new" and

21   "material" and when there is "good cause for the failure to incorporate such evidence into

22   the record in a prior proceeding."  42 U.S.C. § 405(g).  To be material, "the new evidence

23   must bear directly and substantially on the matter in dispute" and there must be a

24   "reasonable possibility that the new evidence would have changed the outcome of the

25   administrative hearing."  *See Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001)

26   (citations omitted).  After a sentence six remand, the Agency assesses the new evidence,

27   makes findings of fact, and issues a decision that is subject to review by the district court.

28   *See* 405 U.S.C. § 405(g).  When remanding pursuant to sentence six, the district court

1   does not consider the merits of the Agency's decision.  *See Melkonyan v. Sullivan*, 501

2   U.S. 89, 98 (1991).

3        Plaintiff argues that the new evidence includes records related to a July 7, 2011

4   MRI and July 5, 2011 nerve conduction studies.  (Doc. 17-1 at 28-31.)   However,

5   evidence of the July 2011 MRI and the July 2011 nerve conduction studies (Doc. 17-1 at

6   28-31) duplicates information that was in the record before the ALJ.   Dr. Kutz

7   summarized this evidence in his August 2011 report, which the ALJ considered.

8   (compare Tr. 482 with Doc. 17-1 at 28-31).   Dr. Kutz prescribed medication and

9   scheduled Plaintiff for an injection, but did not restrict Plaintiff's activities. (Tr. 89, 481-

10  83).   Accordingly, Plaintiff cannot show a "reasonable possibility" that this evidence

11  would have changed the outcome of the administrative hearing.  *See Mayes*, 276 F.3d at

12  462; *see also Mondragon v. Astrue*, 364 Fed. Appx. 346,349 (9th Cir. 2010)

13  (unpublished) (evidence that was consistent with the evidence in the record before the

14  ALJ was not material).

15       Plaintiff also argues that Dr. Kutz's treatment notes from December 2011 through

16  June 2012. (Doc. 17-1 at 14-23), and records related to nerve blocks that Dr. Kutz

17  administered in September and October 2011 are new evidence.  (Doc. 17-1 at 24-31.)

18  Dr. Kutz's treatment notes from December 2011 through June 2012 (Doc. 17-1 at 14-23),

19  and documents pertaining to nerve blocks that Dr. Kutz administered on September 27

20  and October 28, 2011 (Tr. 17-1 at 24-26) post-date the ALJ's decision, but pre-date the

21  Appeals Council's September 21, 2012 decision.   It does not appear that Plaintiff

22  presented this evidence to the Appeals Council.  Thus, even assuming this information is

23  material, Plaintiff has not shown good cause for failing to incorporate this evidence into

24  the administrative record.  *See Sanchez*, 812 F.2d at 511.  Accordingly, this evidence

25  does not provide a basis for remanding this matter under sentence six.

26       Plaintiff argues that documents from Banner Good Samaritan Medical Center

27  regarding Plaintiff's August 2012 back surgery are also new evidence.  (Doc. 17 at 23;

28  *see* Tr. 499-05 and Doc. 17-1 at 10-13).)  Plaintiff presented the documents from Banner

Good Samaritan Medical Center regarding her August 2012 back surgery to the Appeals Council on review of the Commissioner's decision. (Doc. 17 at 23; *see* Tr. 499-05 and Doc. 17-1 at 10-13.) The Appeals Council considered this evidence and made it part of the record. (Tr. 1-5.)[14] This evidence describes the surgical procedure and states that there were no complications during surgery. (Tr. 501.) Notes on the date of discharge indicate that Plaintiff could walk, her pain was controlled with oral pain medication, and that she was stable and in "good" "discharge condition." (Tr. 502.) Although Plaintiff's activities were limited post-surgery, she was advised to follow-up with her doctor in several weeks. (*Id.*) Plaintiff cannot show a "reasonable possibility" that this evidence would have changed the outcome of the administrative hearing. *See Mayes*, 276 F.3d at 462; *see also Mondragon v. Astrue*, 364 Fed. Appx. 346,349 (9th Cir. 2010) (unpublished) (evidence that was consistent with the evidence in the record before the ALJ was not material).

Finally, Plaintiff argues that progress notes from Terros dated October 2012 through March 2013 are new evidence. (Doc. 17-1 at 32-63.) These records post-date the Appeals Council's September 21, 2012 decision and, thus, were created after the Commissioner's decision became final. New reports made after issuance of the Commissioner's final decision "would be material to a new application, but not probative of [plaintiff's] condition at the hearing." *Sanchez v. Sec'y of Health and Human Servs.*, 812 F.2d 509, 512 (9th Cir. 1987).

Plaintiff argues that "good cause" exists for this new evidence because the reports were not made until after the Appeals Council issued its final decision. (Doc. 21 at 11.) This does not establish "good cause." *Mayes* holds that when a plaintiff obtains new evidence after the Commissioner's final decision has been rendered, he satisfies the good cause standard by "demonstrat[ing] that the new evidence was unavailable earlier." 276

---

[14]    The Appeals Council incorporated the following medical records into the administrative record: treatment records from Terros ,dated July 20, 2012 (Tr. 487-493); treatment records from Arizona Neurosurgery and Spine Specialists, dated July 24, 2012 (Tr. 494-498), and treatment records from Banner Good Samaritan Hospital, dated August 8-9, 2012 (Tr. 499-505).

F.3d at 463 (citing *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir.1985)).   Merely obtaining a new report after the ALJ has ruled does not satisfy this standard because it does not demonstrate that Plaintiff was unable to obtain the evidence in time for the hearing before the ALJ.   *See Key*, 754 F.2d at 1551 (finding that when plaintiff seeks a new medical opinion after being denied benefits, the new evidence does not meet the good cause standard).   Accordingly, the medical evidence that postdates the Appeals Council's decision is not appropriate for inclusion in the administrative record and does support a sentence six remand.   Instead, Plaintiff may use this evidence as the basis for a new application for benefits.   *Sanchez*, 812 F.2d at 512.

In addition, Plaintiff has not established good cause for failing to obtain the new evidence during the administrative proceedings.   Plaintiff was represented by her present counsel during the Appeals Council review process.   (Tr. 76.)   Plaintiff has not provided any reason why she could not obtain this information from her doctors during the Appeals Council review process.   *See* 20 C.F.R. § 404.970(b) (authorizing claimants to submit new and material evidence to the Appeals Council); *Mayes*, 276 F.3d at 463 ("The claimant must also establish good cause for not having sought the [evidence] earlier.").

**VII.   Conclusion**

In summary, the Commissioner's final decision is supported by substantial evidence and free from legal error.   Additionally, a sentence six remand is not appropriate because Plaintiff has not shown materiality and good cause.

Accordingly,

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1    **IT IS ORDERED** that that the Commissioner's decision denying Plaintiff

2    benefits in this case is **AFFIRMED**.  The Clerk of Court shall enter judgment in favor of

3    the Commissioner and against Plaintiff and terminate this action.

4    Dated this 8th day of January, 2014.

5

6

7

8    Bridget S. Bade

United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28